David Arnold Nelson GRIGGS, a minor, by and through David Arnold GRIGGS, as Natural Parent and Next Friend, Plaintiff,

v.

**FORT WAYNE SCHOOL BOARD, et al., Defendants.**

No. 1:04–CV–059.

United States District Court, N.D. Indiana, Fort Wayne Division.

March 10, 2005.

John C. Drier, Blume, Connelly, Jordan & Stucky, Fort Wayne, IN, for Plaintiff.

Thomas A Carton, Bullaro & Carton Chartered, Munster, IN, Matthew J. Elliott, Beckman Lawson LLP, Fort Wayne, IN, for Defendants.

### MEMORANDUM OF DECISION AND ORDER

COSBEY, United States Magistrate Judge.

## I.  INTRODUCTION

David Arnold Nelson Griggs is a student at Elmhurst High School (a public school in Fort Wayne, Indiana) and a strong supporter of the United States Marines. Wishing to publicly express his admiration for American troops overseas, he came to school wearing a T-shirt that reads:

**My Rifle**

**The Creed of a United States Marine**

This is my rifle.  There are many like it, but this one is

mine. My rifle is my best friend.  It is my life.

I must master it as I must master my life.

My rifle, without me, is useless.  Without my rifle, I am

useless. I must fire my rifle true.  I must shoot

straighter than my enemy who is trying to kill me. I

must shoot him before he shoots me. I will . . .

A large picture of an M16 rifle (the standard weapon of the Marines) appears between the two stanzas of the creed, and the seal of the Marines is beneath the last line of text.[1]

Administrators at Elmhurst felt that Griggs's T-shirt was "inappropriate for the educational setting," and they forbade him from wearing it to school again. Griggs, however, believes that the First Amendment's guarantee of freedom of speech gives him the right to wear the shirt. He also believes that the school's dress code, which prohibits students from wearing "apparel depicting . . . symbols of violence," is an impermissibly broad restriction on student speech. Accordingly, he brought this suit against the Fort Wayne School Board and various school officials. He seeks no damages, but only an injunction allowing him to wear the shirt and prohibiting the school from enforcing its ban on "symbols of violence."[2]

Both Griggs and the defendants (referred to collectively as "the Board") have now moved for summary judgment.[3] After considering the motions and the relevant law, the Court finds that the Board's ban on "symbols of violence" is permitted by the First Amendment, but the ban on Griggs's particular shirt is not. Therefore, Griggs's motion will be GRANTED in part and DENIED in part, and the Board's

motion will also be GRANTED in part and DENIED in part.

## II.  FACTS[4]

Elmhurst is part of Fort Wayne Community Schools ("FWCS"), and thus its students are governed by FWCS's Student Rights and Responsibilities Code. Rule 3 of the Code covers dress:

Students and parents are expected to display good judgment in making sure students' clothing is neat, clean, and appropriate for the classroom. Students are expected to wear shoes. Hats, sunglasses, and coats or jackets may not be worn inside the school building.

*Inappropriate clothing or other attire that may disrupt the classroom is not allowed. Examples include* shirts, sweatshirts, or other clothing with slogans, sayings, or messages that are solicitous, profane, obscene, or advertise such things as beer, illegal substances, etc.; bare-midriff shirts or blouses, short shorts (if the school permits shorts to be worn), see-through clothing, and other improperly revealing apparel; apparel representative of or worn in a way to indicate gang affiliation; and/or *apparel depicting* derogatory or inflammatory racial, ethnic, religious slogans or symbols, or *symbols of violence.* Students who are dressed inappropriately will be asked to change or remove the offending article.

(Emphasis added.)

Elmhurst has eight administrators, all of whom are responsible for enforcing the

---

1.  A reproduction of the shirt is attached as Appendix A to this opinion.
 [Editor's Note: Appendix A is not included in this publication]

2.  Griggs's complaint also asserts several other federal and state constitutional claims. As will be seen, these appear to be mere afterthoughts to his First Amendment claims, and are all either duplicative or meritless.

3.  This Court has subject matter jurisdiction under 28 U.S.C. § 1331. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

4.  The facts are largely undisputed. For brevity's sake, they are recited here without citation to the record.

provisions of the Code. Discipline of students is divided alphabetically by the student's last name, and the name "Griggs" falls under the jurisdiction of Assistant Principal John Mohr. According to Mohr, Griggs is "a very good student" who has had "very few discipline issues."

Griggs first wore the Marine Creed shirt to school on March 17, 2003. A disapproving Elmhurst administrator (Griggs does not recall which one) saw the shirt during lunchtime and told him to either take it off or turn it inside out. Griggs refused, claiming he had a right to wear the shirt, and the administrator threatened to suspend him. Griggs still refused, but rather than disciplining him, the administrator simply ordered him not to wear it in the future.

Despite having escaped suspension, Griggs was upset by the incident. He had worn the shirt to school to "support our Marines," as reading the creed reprinted on the shirt gives him "a feeling of pride for [his] fellow countrymen that are going to war and dying for [his] freedom."[5] Thus, he "didn't see any reason" why he shouldn't wear it to school. After discussing the matter with his father on the evening of the 17th, he decided to wear the shirt again the next day, in order to "make a point."

At lunchtime on the 18th, Griggs's shirt again caught the attention of an administrator. The previous day's conversation was basically repeated: the administrator told Griggs to take off the shirt or turn it inside out, Griggs refused, the administrator threatened to suspend him, and Griggs still refused. This time the administrator sent Griggs to Mohr's office for discipline.

Mohr discussed the shirt with Principal Laura Taliaferro, and they decided that it was "not appropriate" for school. They objected both to the depiction of a gun and to some of the words on the shirt, specifically the lines "I must shoot straighter than my enemy who is trying to kill me. I must shoot him before he shoots me." They again ordered Griggs to either take

---

5. The creed on Griggs's shirt was authored by a Marine officer, Major General W.H. Rupertus, following the attack on Pearl Harbor. According to the Marines' official website, every Marine memorizes the creed during recruit training. *See* http://www.usmc.mil/marinelink/mcn2000. nsf/lookupstoryref/20037299426.

Griggs's shirt actually reprints only part of Rupertus's creed. The full text is:

This is my rifle. There are many like it, but this one is
mine. My rifle is my best friend. It is my life.
I must master it as I must master my life. My rifle, without me, is useless. Without my rifle, I am
useless. I must fire my rifle true. I must shoot
straighter than my enemy who is trying to kill me. I
must shoot him before he shoots me. I will . . .
My rifle and myself know that what counts in this war is not
the rounds we fire, the noise of our burst, nor the smoke we make. We know that it is the hits
that count. We will hit . . .
My rifle is human, even as I, because it is my life. Thus,
I will learn it as a brother. I will learn its weakness, its strength, its parts, its accessories,
its sights and its barrel. I will keep my rifle clean and ready, even as I am clean and ready. We will
become part of each other. We will . . .
Before God I swear this creed. My rifle and myself are
the defenders of my country. We are the masters of our enemy. We are the saviors of my life.
So be it, until victory is America's and there is no enemy,
but Peace.
*See* http://www.arlingtoncemetery.net/whruper.htm.

the shirt off or turn it inside out. Griggs continued to refuse, explaining that he considered the shirt a patriotic tribute to American troops overseas and believed he had a right to wear it. Mohr and Taliaferro then decided that Griggs would have to go home for the day, and they sent him to the in-school suspension room to wait for his father to pick him up. While detained in the in-school suspension room, Griggs observed a Marines recruiting poster on the wall; the poster depicts a Marine carrying a rifle virtually identical to the one on Griggs's shirt.

Griggs's father soon arrived at school. Before taking his son home, he requested that Taliaferro explain to him in writing why Griggs could not wear the shirt. A few days later, he received Taliaferro's curt reply:

> Dear Mr. Griggs,
> Elmhurst High School is requesting that Nelson not wear the shirt containing the graphic of the gun at school as we feel it is inappropriate for the educational setting.
> Sincerely,
> Laura Taliaferro

Griggs has since refrained from wearing the shirt to school. The school did not impose any formal discipline on him for wearing the shirt, nor do the incidents described here appear on his record.

At the time Mohr and Taliaferro banned Griggs's shirt, the Elmhurst community was still feeling the effects of the tragic murder of Cheri Sue Hartman. In August 2002, Hartman, a senior at Elmhurst, was kidnapped, tortured, and brutally murdered; her body was then set on fire. This crime, which received widespread publicity in the Fort Wayne area, was committed by a group of Hartman's acquaintances, at least two of whom were former Elmhurst students. At the time Griggs wore his shirt to school, relatives of both Hartman and her murderers still attended Elmhurst, and there were occasional confrontations between the two camps.

While the Hartman kidnapping and murder occurred away from school, many other, far less serious incidents have occurred within Elmhurst and other FWCS facilities. Systemwide, 274 students have been disciplined for weapons violations in the last three years; eighteen of these incidents involved firearms (the record does not reveal how many, if any, of these incidents occurred at Elmhurst). There were also several hundred cases of students assaulting one another at FWCS schools in the last three years. However, there is no evidence that any of these hundreds of weapons violations or assaults were sparked by a student's "inappropriate" clothing. In fact, Taliaferro cannot recall any incidents during the 2002–03 school year where a student's clothing caused a disruption of any sort.

More particularly, there is no evidence that Griggs's shirt caused a disruption or that any student complained about it. No students made any comments to Griggs about the shirt, other than to inquire why school officials would not let him wear it. Mohr testifies that he and Taliaferro did not even consider whether the shirt might be disruptive, but instead banned it because it was not "appropriate":

> Q. [I]s there a rule that relates to the appropriateness of [Griggs's] tee shirt?
>
> A. Well, I think the rule there probably would be that, you know, could it cause or would it cause a disruption, you know, about a student wearing a shirt like that.
>
> Q. But in your discussion with [Taliaferro] that issue didn't come up, right?
>
> A. Causing a disruption?

Q. Yes.

A. No, not necessarily, because there hadn't been, there hadn't been a disruption with it. It was dealing all about the appropriateness of that.

Q. But what I'm trying to get to is she didn't say anything to you about the possibility of a disruption, did she?

A. No, we didn't talk about that.

## III. STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir.2003). When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest

on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

The existence of cross-motions for summary judgment does not necessarily mean that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., Inc. v. Int'l Union of Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir.2003). Rather, the process of taking the facts in the light most favorable to the nonmovant, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the Court's] review of the record requires that [the Court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir.2001) (quoting *Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir.1998)).

## IV. DISCUSSION

While Griggs invokes several clauses of both the United States and Indiana Constitutions, the heart of this dispute concerns only the First Amendment, and thus we begin there. The two principal issues to be resolved are whether the First Amendment allows the Board to (1) generally proscribe clothing "depicting ... symbols of violence"; and (2) forbid Griggs from wearing his Marine Creed shirt in school.[6]

To answer these questions, the Court must first determine the extent to

---

6. The Board inexplicably insists that only the first of these issues is before the Court; that is, it repeatedly claims that Griggs's suit only challenges the breadth of the Code, not the particular application of the Code to his shirt. (*See, e.g.,* Def.'s Mem. in Supp. of Mot. for Summ. J. at 13.) To the contrary, both the complaint and Griggs's briefs make clear that

he challenges both the breadth of the Code and its application to him. (*See* Compl. at 9 ("Defendants' *implementation* of the offending provisions of the CODE violates *Plaintiff's* right of freedom of speech" (emphasis added)); Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 10). Thus, the Court will consider both claims.

which the First Amendment protects the speech of students in public schools.[7]

### A. Overview of Student Free–Speech Rights

■ The First Amendment protects the individual's right to freedom of speech and expressive conduct. *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). "These freedoms are delicate and vulnerable, as well as supremely precious in our society." *N.A.A.C.P. v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). However, the freedom of speech is not absolute, as it must sometimes give way to "subordinating valid governmental interests." *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961).

The boundaries of a student's free-speech rights in public school are particularly difficult to set. As the Supreme Court has observed:

> First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.... On the other hand, the Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools....

Our problem lies in the area where students in the exercise of First Amendment rights collide with the rules of the school authorities.

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506–07, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). The Court has attempted to balance these competing values in a trilogy of school-speech cases. As we shall soon see, the proper interpretation of these cases is vigorously disputed by the parties and within and among the Circuit Courts of Appeals. But we must start with the cases themselves.

The first, *Tinker*, involved a group of students who were disciplined for wearing black armbands to protest the Vietnam War. 393 U.S. at 504, 89 S.Ct. 733. The Court first characterized the school's action as a regulation of "pure speech," as opposed to "regulation of the length of skirts or the type of clothing, to hair style, or deportment." *Id.* at 507–08, 89 S.Ct. 733. The Court then held that the school could not ban the armbands, as there was "no evidence whatsoever of ... interference, actual or nascent, with the schools' work or of collision with the rights of other students to be secure and to be let alone." *Id.* at 508–09, 89 S.Ct. 733. Importantly, the school's "undifferentiated fear or apprehension of disturbance [was] not enough to overcome the right to freedom of expression"; rather, the school officials had to show "facts which might reasonably have led [them] to forecast substantial dis-

---

**7.** Neither party raises the question of whether Griggs's wearing of the shirt constitutes "speech" for purposes of First Amendment analysis. Nonverbal conduct, such as wearing a certain article of clothing, is "speech" if it is "sufficiently imbued with elements of communication"; that is, if "an intent to convey a particularized message was present, and the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404, 109 S.Ct.

2533, 105 L.Ed.2d 342 (1989) (internal citation omitted). The Board does not claim that Griggs's shirt fails to meet this definition, and wisely so: it is undisputed that Griggs intended to convey a message of support for the Marines, and it is likely that viewers would understand the message, as the shirt is proudly emblazoned with "The Creed of a United States Marine" and the Marines' seal. Thus, Griggs's wearing of the shirt qualifies as "speech."

ruption of or material interference with school activities," which they failed to do. *Id.* at 508, 514, 89 S.Ct. 733. Thus, *Tinker* stands for the proposition that a student's "pure speech" in school cannot be banned absent a reasonable forecast of "substantial disruption."

The second case in the trilogy is *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). In *Fraser*, the plaintiff made a speech at a school assembly nominating another student for an elected office. *Id.* at 677, 106 S.Ct. 3159. However, the plaintiff "referred to his candidate in terms of an elaborate, graphic, and explicit sexual metaphor," and thus the school punished him.[8] *Id.* at 677–79, 106 S.Ct. 3159. The Court of Appeals, applying the *Tinker* test ("reasonable forecast of substantial disruption"), ruled for the plaintiff. *Id.* at 680, 106 S.Ct. 3159. But the Supreme Court reversed, distinguishing the "nondisruptive, passive expression of a political viewpoint in *Tinker*" from the "offensively lewd and indecent speech" of the plaintiff. *Id.* at 680, 685, 106 S.Ct. 3159. The Court held that the school's interest in "teaching students the boundaries of socially appropriate behavior" gave it the right to determine "what *manner* of speech in the classroom or in school assembly is inappropriate." *Id.* at 681, 683, 106 S.Ct. 3159 (emphasis added). Thus, "it was perfectly appropriate for the school to ... make the point to the pupils that vulgar speech and lewd conduct [are]

wholly inconsistent with the 'fundamental values' of public school education." *Id.* at 685–86, 106 S.Ct. 3159.

The final chapter of the trilogy is *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). In *Hazelwood*, students sued when school officials refused to print two student-written articles in a school newspaper; the officials felt that the articles, which dealt with the effects of teenage pregnancy and divorce on the school's students, did not sufficiently protect the identity of the students referenced in them and contained material inappropriate for younger students. 484 U.S. at 263. The Court of Appeals held that the school newspaper (which was produced as part of an advanced journalism class) was a "public forum," applied the *Tinker* test, and found in favor of the students. *Id.* at 265–66, 108 S.Ct. 562. The Supreme Court reversed.

The Court first disagreed with the lower court's conclusion that the school newspaper was a "public forum," holding that it was instead "reserved ... as a supervised learning experience for journalism students." *Id.* at 270, 108 S.Ct. 562. The Court then explained the difference between the speech in *Tinker* and the articles pulled from the newspaper:

> The question whether the First Amendment requires a school to tolerate particular student speech—the question that we addressed in *Tinker*—is different

---

**8.** The offending speech read:

I know a man who is firm—he's firm in his pants, he's firm in his shirt, his character is firm—but most of all, his belief in you, the students of Bethel, is firm.

Jeff Kuhlman is a man who takes his point and pounds it in. If necessary, he'll take an issue and nail it to the wall. He doesn't attack things in spurts—he drives hard, pushing and pushing until finally—he succeeds.

Jeff is a man who will go to the very end—even the climax, for each and every one of you.

So vote for Jeff for A.S.B. vice president—he'll never come between you and the best our high school can be.

*Fraser*, 478 U.S. at 687, 106 S.Ct. 3159 (Brennan, J., concurring).

from the question whether the First Amendment requires a school affirmatively to promote particular student speech. The former question addresses educators' ability to silence a student's personal expression that happens to occur on the school premises. The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school.... Educators are entitled to exercise greater control over this second form of student expression.... Hence, a school may in its capacity as publisher of a school newspaper or producer of a school play dissociate itself ... not only from speech that would "substantially interfere with [its] work ... or impinge upon the rights of other students," *Tinker,* 393 U.S., at 509, 89 S.Ct., at 738, but also from speech that is, for example, ungrammatical, poorly written, inadequately researched, biased or prejudiced, vulgar or profane, or unsuitable for immature audiences.

*Id.* at 270–71, 108 S.Ct. 562 (internal citation omitted). The Court then formulated a different test for school-sponsored speech: "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech *in school-sponsored expressive activities* so long as their actions are *reasonably related to legitimate pedagogical concerns." Id.* at 273, 108 S.Ct. 562 (emphasis added). The Court determined that the school's actions satisfied this test and ruled in its favor. *Id.* at 274–76, 108 S.Ct. 562.

The most common interpretation of these three cases, and the one that Griggs prefers, is that *Tinker* provides the default rule for suppression of student speech, and *Fraser* and *Hazelwood* create narrow exceptions to the rule. On this view, student speech generally cannot be banned unless the school presents facts that could reasonably lead it "to forecast substantial disruption of ... school activities." *Tinker,* 393 U.S. at 514, 89 S.Ct. 733. However, this rule does not apply where the school objects to the *"manner* of speech" rather than its content; therefore, schools may ban offensive, lewd, or indecent speech regardless of its potential for disruption. *Fraser,* 478 U.S. at 683, 685, 106 S.Ct. 3159 (emphasis added); *Hazelwood,* 484 U.S. at 271 n. 4, 108 S.Ct. 562 ("The dissent perceives no difference between the First Amendment analysis applied in *Tinker* and that applied in *Fraser.* We disagree. The decision in *Fraser* rested on the 'vulgar,' 'lewd,' and 'plainly offensive' character of [the] speech.") The *Tinker* rule also does not apply to speech that is (or reasonably appears to be) sponsored by the school; rather, educators may regulate school-sponsored speech "so long as their actions are reasonably related to legitimate pedagogical concerns," assuming that the speech was not in a public forum. *Hazelwood,* 484 U.S. at 271, 273, 108 S.Ct. 562.

Under such an analysis, the Board's ban on Griggs's Marine Creed shirt would fall under the ambit of *Tinker.* The shirt's message is not presented in an offensive, lewd or indecent manner, so *Fraser* would not apply, and shirt's message is not sponsored by the school (nor could it reasonably appear to be), so *Hazelwood* would not apply either. Rather, Griggs's shirt is speech that "happen[ed] to occur on the school premises," and thus it could not be banned unless the Board meets *Tinker's* "substantial disruption" test. *Hazelwood,* 484 U.S. at 270–71, 108 S.Ct. 562 ("the question that we addressed in *Tinker* ... [involved] educators' ability to silence a student's personal expression that happens to occur on the school premises.")

Griggs is not alone in viewing the *Tinker–Fraser–Hazelwood* trilogy this way— eight Courts of Appeals have adopted identical or similar interpretations. *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 211–14 (3rd Cir.2001); *Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 255–57 (4th Cir.2003); *Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 614–15 and n. 16 (5th Cir.2004); *Castorina v. Madison County Sch. Bd.*, 246 F.3d 536, 542–43 (6th Cir.2001); *Henerey v. City of St. Charles*, 200 F.3d 1128, 1131–32 (8th Cir.1999); *Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524, 529 (9th Cir.1992); *Fleming v. Jefferson County Sch. Dist. R–1*, 298 F.3d 918, 923–24 (10th Cir.2002); *Bannon v. Sch. Dist. of Palm Beach County*, 387 F.3d 1208, 1214 (11th Cir.2004). But the Seventh Circuit, whose opinions this Court is bound to apply, has charted a different course.

In *Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530 (7th Cir.1996), the Seventh Circuit considered whether the First Amendment allows a school to ban a student from distributing invitations to a religious gathering. 98 F.3d at 1532. The majority opinion began by identifying "two important but at times conflicting educational concepts" in the Supreme Court's jurisprudence: first, "the traditional view which holds that children are in the temporary custody of the state as 'schoolmaster,'" and second, the concept that "school children are autonomous individuals, treated as adults, entitled to free speech rights during school hours." *Id.* at 1535–36. The majority identified *Tinker* as an example of the second concept and *Fraser* and *Hazelwood* as examples of the first. *Id.* at 1536–37. The majority also put great emphasis on *Hazelwood's* "initial determina-

tion of the type of forum at issue," and it seemed to imply that *all* student free-speech cases must now begin with such an analysis, regardless of whether the speech at issue is school-sponsored as in *Hazelwood*. *Id.* at 1537, 1539 ("*Hazelwood* stressed the importance of determining whether a public or nonpublic forum is at issue. Thus, we begin by analyzing what kind of forum this ... school is.")

Having laid that foundation, the majority then announced that, absent a public forum, the *Hazelwood* test ("reasonably related to legitimate pedagogical concerns") applies to *all* student speech. *Id.* at 1537–38. The majority did not address *Hazelwood's* explicit distinction between speech "that happens to occur on the school premises" and speech that one "might reasonably perceive to bear the imprimatur of the school." *Hazelwood*, 484 U.S. at 270–71, 108 S.Ct. 562. Rather, it focused only on the distinction between public and nonpublic forums, and held that all student speech in a nonpublic forum is governed by the *Hazelwood* test, regardless of whether the speech was (or could be seen as) school-sponsored. *Muller*, 98 F.3d at 1537–38. This interpretation of *Hazelwood* seems to restrict *Tinker*, but the majority avoided that question in an oblique footnote. *Id.* at 1538 n. 5 ("Some might consider *Hazelwood* a narrowing of the free speech rights *Tinker* had granted public high school students.... We need not draw that conclusion; rather we can take *Hazelwood's* non-public forum analysis at face value.") Applying its new interpretation, the majority found that the school was not a public forum and that the administrators' actions met the *Hazelwood* test.[9] *Id.* at 1539–43.

9. Judge Rovner filed a concurring opinion pointedly explaining her disagreement with the majority's reasoning:

The Court [in *Hazelwood*] carefully distinguished the issue whether a school is required to tolerate student speech that oc-

As noted earlier, Griggs urges this Court to apply the *Tinker* test, and if this case was brought in the Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, or Eleventh Circuit, that analysis would prevail. However, *Muller* remains the law of this Circuit, and therefore this Court is bound to apply the *Muller/Hazelwood* standard instead.

**B. The First Amendment Allows the Board to Generally Prohibit "Apparel Depicting ... Symbols of Violence"**

■ This lawsuit had its genesis in Mohr and Taliaferro's decision to forbid Griggs from wearing his Marine Creed shirt to school. As we will later see, that decision cannot stand. But Griggs's claims go beyond just his particular shirt; he contends that Rule 3 of the Code, insofar as it bans "apparel depicting ... symbols of violence," is too broad to pass constitutional muster and thus must be struck down. Here, Griggs goes much too far. Rule 3 is clearly within the confines allowed by the First Amendment.

Griggs invokes the overbreadth doctrine, an "expansive remedy" created "out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech." *Virginia v. Hicks*, 539 U.S. 113, 119, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003). Under this doctrine, a court may invalidate all enforcement of a law, upon a showing that

the law "punishes a substantial amount of protected free speech, judged in relation to the [law's] plainly legitimate sweep." *Id.* at 118–19, 123 S.Ct. 2191 (internal quote marks omitted). Because this doctrine has wide-reaching effects, it must be employed "with hesitation" and "only as a last resort." *Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39, 120 S.Ct. 483, 145 L.Ed.2d 451 (1999). Moreover, "because of the duties and responsibilities of the public ... schools, the overbreadth doctrine warrants a more hesitant application in this setting than in other contexts." *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 259 (3rd Cir.2002).

As noted previously, this Court is bound to apply the *Muller/Hazelwood* standard to schools' restrictions on speech. Thus, the basic question is whether Rule 3 is "reasonably related to legitimate pedagogical concerns." *Muller*, 98 F.3d at 1537–38. There can be no doubt that it is.

It is indisputable that schools have a legitimate pedagogical concern in preventing violence in their facilities. As other courts have recognized, this concern is particularly pressing in the wake of Columbine and similar tragedies:

[W]e live in a time when school violence is an unfortunate reality that educators must confront on an all too frequent basis. The recent spate of school shoot-

curs on school premises (which the Court had resolved in *Tinker*), from the issue in *Hazelwood* concerning the degree of control educators may retain over 'student speech that is disseminated under [the school's] auspices.' It was in this context, then, that the Court held that educators may exercise control over the content of student speech 'in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns.' ... Yet the Code we are examining governs only the display or distribution of printed materials that originate with the students

themselves, outside the purview of any school-sponsored activity. I thus remain unconvinced that a reasonableness standard is applicable to this case, and believe that a more searching review, akin to that in *Tinker*, is appropriate, particularly because the Code at issue here involves a prior restraint on student speech.

*Id.* at 1546 (Rovner, J., concurring in part and in the judgment). Despite this disagreement, however, Judge Rovner agreed that the school should win, as she believed its actions also passed muster under the *Tinker* test. *Id.* at 1547.

ings have put our nation on edge and have focused attention on what school officials, law enforcement and others can do or could have done to prevent these kinds of tragedies. After Columbine, Thurston, Santee and other school shootings, questions have been asked about how teachers or administrators could have missed telltale warning signs. *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 987 (9th Cir.2001); *see also Porter v. Ascension Parish Sch. Bd.*, 301 F.Supp.2d 576, 583 (M.D.La.2004), *aff'd*, 393 F.3d 608 (5th Cir.2004). A general prohibition on "apparel depicting ... symbols of violence" is certainly a reasonable way for the Board to discourage such violence in its schools.

We must first recognize that the Rule is primarily a regulation of *dress* rather than *speech*. Accordingly, much of what the Rule bans is not even subject to First Amendment protection. *See Johnson*, 491 U.S. at 404, 109 S.Ct. 2533 (limiting "speech" to intended, particularized messages that observers are likely to understand). For instance, the Rule prohibits bare midriffs, short shorts, and other revealing attire, none of which qualifies as "speech." *Tinker*, 393 U.S. at 507–08, 89 S.Ct. 733 (differentiating "pure speech" from such things as "the length of skirts"); *Zalewska v. County of Sullivan, New York*, 316 F.3d 314, 319–21 (2nd Cir.2003) (holding that act of wearing skirt to work is not "speech"); *Olesen v. Bd. of Educ. of Sch. Dist. 228*, 676 F.Supp. 820, 822 (N.D.Ill.1987) (holding that male's wearing of earring to school is not "speech"). Similarly, many "symbols of violence" that are banned by the Rule will not qualify as "speech," and thus the First Amendment will not even come into play. For instance, imagine that Griggs's shirt featured only the M16, with no accompanying text. That shirt probably would not constitute "speech" (an intended, particularized

message that observers are likely to understand, *Johnson*, 491 U.S. at 404, 109 S.Ct. 2533), and thus its prohibition under the Rule would not implicate the First Amendment at all.

Granted, some symbols of violence will be presented in a context that constitutes "speech"—Griggs's actual Marine Creed shirt is one example—and there the First Amendment will have to be considered. But even then, the Rule will operate to prohibit much speech which the First Amendment allows it to prohibit. Obviously, if the school can ban speech for any reason related to a legitimate pedagogical concern, *Muller*, 98 F.3d at 1537–38, then it can ban many messages containing symbols of violence. The Board imagines two extreme examples: (1) a shirt depicting a woman being raped, with the legend "She Had It Coming"; and (2) a portrayal of the Columbine massacre, with the text "Trench Coat Mafia Victory Tour 2005." Clearly, Rule 3 would operate to ban these shirts, and that ban would be permissible under *Muller*.

In short, the "legitimate sweep" of Rule 3's ban on "symbols of violence" is vast. *See Hicks*, 539 U.S. at 119, 123 S.Ct. 2191. Much of what it bans is either (1) not speech at all; or (2) speech which *Muller* allows it to ban. Griggs contests none of this, but instead goes to great lengths to dream up instances where the Rule might censor constitutionally protected speech. For instance, he suggests that the Rule would prohibit a shirt emblazoned with the seal of this Court, which features an eagle with arrows (a symbol of violence) clutched in its talons. But it is unlikely that any school administrator would find this Court's seal objectionable, even if it does technically contain "symbols of violence." More importantly, even if the Rule would ban such protected speech, "the mere fact that one can conceive of some impermissible applications of a statute is not suffi-

cient to render it [overbroad]." *Sequoia Books, Inc. v. Ingemunson*, 901 F.2d 630, 638 (7th Cir.1990). Rather, Griggs must show that the Rule bans a "substantial amount" of protected speech in comparison to its legitimate reach. *Hicks*, 539 U.S. at 118–19, 123 S.Ct. 2191. This he has failed to do. Therefore, the Court finds that Rule 3's prohibition of "apparel depicting ... symbols of violence" is not overbroad.[10]

### C. The First Amendment Does Not Allow the Board to Ban Griggs's Particular Shirt

As explained *supra*, Rule 3's prohibition on "symbols of violence" is constitutional, as it is "reasonably related" to the Board's "legitimate pedagogical concern" of preventing school violence. *Muller*, 98 F.3d at 1537–38. But this does not mean that every application of Rule 3 will pass constitutional muster; even a permissible regulation might occasionally be used to censor more speech than the First Amendment allows. As it turns out, the Board's ban on Griggs's Marine Creed shirt presents just such a case. Whether it is analyzed under the *Muller/Hazelwood* test as required by the Seventh Circuit, or under the *Tinker* test adopted by eight other circuits, the prohibition on Griggs's shirt reaches a bit too far.

### 1. The Board's Ban on Griggs's Shirt Does Not Meet the Muller/Hazelwood Test

Under *Muller*, the first question is whether Elmhurst High School, where Griggs's speech took place, is a "public forum." *Id.* at 1539. School facilities are public forums only if "school authorities have 'by policy or by practice' opened these facilities 'for indiscriminate use by the general public,' or by some segment of the public, such as student organizations." *Hazelwood*, 484 U.S. at 267, 108 S.Ct. 562. There is no evidence that Elmhurst has been opened for such "indiscriminate use," nor does Griggs claim that it has; to the contrary, Rule 3 of the Code puts many restrictions on the messages that can be displayed in the school. Accordingly, Elmhurst is not a public forum. *See Muller*, 98 F.3d at 1539–40 (finding a public school to be a nonpublic forum); *Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118*, 9 F.3d 1295, 1302 (7th Cir.1993) (same).

Since Griggs's speech occurred in a nonpublic forum, *Muller* requires this Court to uphold the Board's ban on the speech as long as it is "reasonably related to legitimate pedagogical concerns." *Muller*, 98 F.3d at 1540. But even under this "deferential approach," *id.* at 1537, the Board fails to meet its burden.

The Board proffers several arguments in support of its actions, none of which are persuasive. But before examining these arguments individually, it should be noted that they all suffer from a common flaw: they rest on a mischaracterization of Griggs's shirt. The Board repeatedly describes the shirt as follows: "[Griggs] ...

---

**10.** Griggs relies heavily on *Newsom*, a Fourth Circuit case, to support his overbreadth argument. But *Newsom* is inapplicable here, as the Fourth Circuit applied the *Tinker* test to the speech in that case. 354 F.3d at 257. This Court is bound by *Muller* to apply the *Hazelwood* test, a point which Griggs's analysis completely overlooks.

Besides, even if this Court were free to apply *Tinker*, the analysis would not be any different. Quite a bit of speech containing symbols of violence is reasonably likely to cause "substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 508, 514, 89 S.Ct. 733. Thus, Griggs still could not show that Rule 3 bans a "substantial amount" of protected speech in comparison with its "legitimate sweep." *Hicks*, 539 U.S. at 118–19, 123 S.Ct. 2191.

expressed his support for U.S. troops [with] a prominently displayed assault rifle and a message about killing his enemies before they kill him" (Def.'s Mem. in Supp. at 15); "[an] expression[ ] regarding killing one's enemies with an assault rifle" (*id.* at 16); "a prominently displayed assault rifle, accompanied by a message about killing one's enemies" (Def.'s Mem. in Opp'n at 12); "[an] obsessive tone and pledge to preemptively kill one's enemies" (*id.* at 13). These descriptions are all inaccurate, because they ignore the obvious context of the shirt: "The Creed of a United States Marine." The Board consistently suggests that the shirt's message is about *Griggs* "killing his enemies before they kill him," or alternatively about some unidentified third person's "pledge to preemptively kill *one's* enemies." But even a cursory examination of the shirt reveals that it concerns only a *United States Marine's* pledge to shoot *his* enemies—that is, the enemies of this country. The subtitle at the top of the shirt and the seal of the Marines at the bottom make that quite clear.

Admittedly, the dominant feature of the shirt is the graphic of the M16—the gun is what first catches one's eye. (*See* App. A to this opinion.) It is therefore understandable that the shirt twice caught the attention of an administrator in Elmhurst's lunchroom. Moreover, the Court recognizes that some viewers, depending on their general attitude toward guns, might have a visceral, negative reaction upon first seeing the M16. For instance, Taliaferro has a "personal objection" to guns, and it is likely that this belief colored her first impressions upon seeing the shirt. But whatever one's instinctive reaction to the shirt is, it only takes a few seconds of study to realize that the gun is placed in the context of a relatively benign message of support for the military. It is not a threat of violence by Griggs or a general celebration of killing "one's" enemies, as

the Board claims; rather, its references to violence are limited to a military context. As detailed below, this fundamental misconception by the Board fatally weakens each of its arguments.

The Board's principal argument is that, in the wake of tragic school shootings at Columbine High School and elsewhere, it has a "legitimate pedagogical interest" in discouraging a "culture of violence" in Elmhurst and other FWCS schools. The Board buttresses this argument by noting that, while it fortunately has not suffered a Columbine-like incident, many students have been disciplined for bringing weapons to school or assaulting one another. Granted, there can be no question that preventing student violence is a legitimate pedagogical interest. *Cf., e.g., LaVine,* 257 F.3d at 987 (noting the pressure on school administrators to prevent Columbine-style shootings); *Porter,* 301 F.Supp.2d at 583 (same). But the Board fails to persuade that banning Griggs's shirt has any "reasonable relat[ion]" to that interest. The shirt, viewed in its obvious context, concerns only violence perpetrated by the Marines against America's enemies; no reasonable observer would think that it related to Columbine or other school shootings in any way.

In a similar vein, the Board argues that it has a legitimate pedagogical interest in soothing the lingering tensions stemming from Cheri Sue Hartman's murder. It is true that there have been confrontations at Elmhurst between Hartman's relatives and her murderers' relatives, and the Board unquestionably has a legitimate interest in defusing such confrontations and preventing them from escalating. But the Board again fails to demonstrate how banning Griggs's shirt has any reasonable relation to that interest. Again, the shirt is not an expression of intended violence by Griggs, nor does it express general ap-

proval of shooting "one's" enemies, as the Board claims. Rather, it expresses only a soldier's vow to shoot the enemies of the United States on the battlefield. No student at Elmhurst, even a relative of Hartman's, should feel threatened or disturbed when reading the shirt.

The Board also makes a slippery-slope argument: if Griggs is allowed to wear this shirt, then what other shirts might Elmhurst have to permit? The Board proffers examples of shirts (for sale on the Internet) with slogans like "Sniper Saloon: The First Round Is On Us," "Don't Make Me Shoot You," "Sniper: No Need To Run ... You'll Only Die Tired," and "Kill 'Em All, Let God Sort 'Em Out." (*See* Def.'s Mem. in Supp. at 17 and Ex. 7.) According to the Board, if Griggs's shirt is allowed, then these shirts must also be allowed, and "the values of civil discourse and traditional moral norms" that Elmhurst tries to inculcate in its students will eventually "be undermined by the day-to-day onslaught of violent imagery." (*Id.*) However, the shirts proffered by the Board are not comparable to Griggs's shirt, as none of them have an explicit military context. (*See id.*) Thus, they could reasonably be construed as a direct threat or approval of violence by the wearer, whereas the words on Griggs's shirt are put in the mouth of a U.S. Marine. In short, allowing Griggs to wear his shirt will not compel the Board to allow these other shirts, as the Board's arguments about preventing school violence would likely be more persuasive when applied to those shirts.

Finally, the Board implies that even if it cannot ban Griggs's shirt under the *Muller/Hazelwood* test, it might still be able to ban it under *Fraser*. At times, the Board

seems to contend that it does not really object to the message of the shirt, but to the manner in which the message is presented: "[Griggs] wishes to wear a shirt to send a political message .... [but] he has chosen an inappropriate manner of doing so. [He] is free to support the troops by wearing all manner of tee shirts, buttons, or other items of clothing that do not contain symbols of violence. *Cf.* [*Fraser*]." (Def.'s Reply at 5.) In other words, the Board suggests that an image of a gun or other symbol of violence can transform otherwise acceptable speech into the sort of lewd, offensive, or indecent *manner* of speech that schools can ban under *Fraser*. This argument is rather disingenuous. The Board obviously does not have a blanket objection to depictions of guns or other symbols of violence in its schools; the very room where Griggs was sent as punishment has a poster of a Marine holding an identical rifle. Moreover, Elmhurst's mascot is the "Trojan," and the school accordingly features a statute of an ancient warrior, his hand resting on the hilt of a sword. (*See* Pl.'s Mot. for Summ. J., Ex. 11.) Thus, the Board's suggestion that depictions of guns or other weapons are *ipso facto* lewd, offensive, or indecent does not hold water. *Fraser* has no application here.

In sum, the Board fails to meet the *Muller/Hazelwood* test, as it has not shown that banning Griggs's shirt is reasonably related to any legitimate pedagogical interest. While the Board certainly has an interest in preventing violence in its schools, it cannot merely incant "Columbine" or "Cheri Sue Hartman" like a magic spell allowing it to ban speech totally unrelated to those tragic incidents.[11] Nor do

---

11. It is worth noting that the Court's conclusion that banning Griggs's shirt is not reasonably related to any legitimate pedagogical concern is buttressed by Mohr and Taliafer-

ro's failure to articulate a legitimate pedagogical concern at the time they banned it. There is no evidence that Mohr and Taliaferro said anything to Griggs or his father about

the Board's other arguments provide any constitutional justification for censoring Griggs's speech. Therefore, Griggs is entitled to an injunction allowing him to wear his Marine Creed shirt to school.[12]

### 2. The Board's Ban on Griggs's Shirt Would Not Meet the Tinker Test Either

As explained in detail *supra*, the Board has failed to justify its ban on Griggs's shirt under the *Muller/Hazelwood* test ("reasonably related to legitimate pedagogical concerns"). However, as also explained *supra*, Griggs believes that the *Tinker* test ("reasonable forecast of substantial disruption") is actually the proper analysis in this case, and a majority of federal circuits would agree. It is worth noting that, if *Tinker* controlled this case as Griggs believes it should, his case for

overturning the ban on his shirt would be even stronger.

Under *Tinker*, the Board would be required to present "facts which might reasonably have led [it] to forecast substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514, 89 S.Ct. 733. No such facts exist. There is no evidence that Griggs's shirt caused a disruption, nor could Taliaferro recall any incidents during that school year where *any* article of a student's clothing caused a disruption. No student complained to administrators or to Griggs about the shirt; the only comments students made to Griggs were along the lines of "why won't they let you wear that shirt?" And while administrators do not have to wait for a disruption to actually happen before banning potentially disruptive speech, *e.g.*, *Chandler*, 978 F.2d at 529 (9th Cir.1992),

---

Columbine, Cheri Sue Hartman, or violence in general. Rather, they gave only the vague explanation that the shirt was "inappropriate." Even after both Griggs and his father explained that they considered the shirt merely a patriotic tribute to American troops, the administrators continued to insist that it was "inappropriate," with no further explanation. The Court does not mean to suggest that the administrators had a constitutional duty to explain their reasoning to Griggs; they did not. But their case would be stronger if they had articulated a plausible reason for banning the shirt at the time, rather than providing Griggs with vague answers and then relying on the *post hoc* rationalizations their attorneys press in this Court.

**12.** The Board makes one other, rather confusing argument, concerning the movie *Full Metal Jacket*.

*Full Metal Jacket* is a 1987 film, directed by Stanley Kubrick and starring Vincent D'Onofrio, which portrays a group of Marine recruits undergoing basic training and a tour of duty in Vietnam. During basic training, D'Onofrio's character is nicknamed "Private Gomer Pyle" by his drill sergeant and fellow recruits, as he consistently lags behind the rest of the group. After suffering escalating physical and mental abuse from his com-

rades, Pyle eventually murders his drill sergeant and then turns his M16 on himself. While committing these acts, Pyle maniacally recites the Marine Creed that is partially reprinted on Griggs's shirt. *See generally* http://www.imdb.com/title/tt0093058; http://www.historyinfilm.com/jacket/plot.htm.

The Board claims that "[f]or many students who have seen *Full Metal Jacket*, [Griggs's] t-shirt would call to mind Pyle's murderous rampage in the film. This is just the type of reference that school officials have a right to prohibit in order to ensure that the basic educational mission of the school system is not thwarted." (Def.'s Mem. in Supp. at 21.)

For starters, the Court doubts that Griggs's shirt would conjure up images of *Full Metal Jacket* for very many Elmhurst students, as it is an R-rated movie released before most of them were even born. The shirt certainly did not conjure such images for Taliaferro when she banned it—she has never seen the film. But even putting those doubts aside, there is a much more fundamental problem with this argument: the Board does not explain how "preventing students from recalling *Full Metal Jacket*" could conceivably be a "legitimate pedagogical interest." This underdeveloped argument is without merit.

the Board proffers no facts which could even "reasonably forecast" a disturbance, *Tinker*, 393 U.S. at 514, 89 S.Ct. 733. As explained at length in the previous section, there is no reason to believe that the shirt might have incited violence or made other students feel threatened. Accordingly, the Board's ban on the shirt does not pass muster under *Tinker*.

At best, Elmhurst's administrators had only an "undifferentiated fear or apprehension of a disturbance," which *Tinker* holds is insufficient to overcome Griggs's right to free speech.[13] *Id.* at 508, 89 S.Ct. 733. Accordingly, if this Court were free to follow the lead of the majority of federal circuits and apply the *Tinker* test, the Board's ban on Griggs's shirt would clearly be untenable.[14]

### D. Griggs's Other Claims Are Without Merit

In addition to the two weighty First Amendment issues analyzed *supra*, Griggs brings several other claims, none of which have merit.

■ Griggs's summary judgment briefs argue at length that Rule 3 is unconstitutionally vague. However, a vagueness claim is not included in his complaint, and the time for amendment is long past. Griggs admits the omission, but argues (without citing any authority) that the Court should consider the claim nonetheless, due to its "similarity" to his overbreadth claim. He is incorrect; overbreadth and vagueness claims are analytically distinct from one another. *See, e.g., Fuller v. Decatur Pub. Sch. Bd. of Educ. Sch. Dist. 61*, 251 F.3d 662, 666 (7th Cir.2001). Accordingly, his vagueness claim is waived. *See, e.g., Cheek v. Peabody Coal Co.*, 97 F.3d 200, 202 (7th Cir.1996) (deeming theory waived because of its omission from complaint).

■ In his complaint, Griggs claims that the Board's ban on his shirt violates the Indiana Constitution's Free Speech

**13.** It appears that the administrators' decision about the shirt did not even go that far; Mohr testified that he and Taliaferro did not discuss the possibility of a disruption. In short, there was no disruption, no objective reason to even fear one, and neither Mohr nor Taliaferro had any subjective concerns in that regard either.

**14.** A comparison with the Ninth Circuit's decision in *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981 (9th Cir.2001), is instructive. In *LaVine*, a school temporarily expelled a student with known suicidal tendencies and a history of disciplinary problems (some violent), after he composed a poem reading in part:

I pulled my gun, from its case, and began to load it.
I remember, thinking at least I won't, go alone, as I, jumpped in, the car, all I could think about, was I would not, go alone.
As I walked, through the, now empty halls, I could feel, my hart pounding.
As I approched, the classroom door, I drew my gun and, threw open the door, **Bang, Bang, Bang–Bang.**

When it was all over, 28 were, dead, and all I remember, was not felling, any remorce, for I felt, I was, clensing my soul.
*Id.* at 983–86 (all spelling, punctuation, and emphasis in original). In light of the student's history, as well as the fear created by Columbine and other school shootings, the school temporarily expelled the student for writing this poem. The Ninth Circuit ruled that the school's action was permissible under *Tinker*. *Id.* at 991–92. However, the court described it as a "close case" which illustrated "how difficult" it is for schools to "balanc[e] safety concerns against chilling free expression." *Id.* at 983, 992.
If *LaVine*, which featured a troubled student writing a poem explicitly describing him murdering his classmates, is a "close case" under *Tinker*, then this case is not close at all. Griggs has no record of violent or troubled behavior, and as explained earlier, his speech cannot be reasonably interpreted as a threat of violence against his classmates or anyone else. Thus, comparison with *LaVine* further demonstrates that the Board's ban on Griggs's speech cannot satisfy the *Tinker* test.

Clause. Ind. Const., Art. I, § 9. But in dozens of pages of summary judgment briefs, he treats this issue in just one (nearly incomprehensible) paragraph (*see* Pl.'s Resp. at 12–13); thus, the Court deems him to have waived the argument. In any event, this undeveloped claim would be redundant, as Griggs's First Amendment claim successfully struck down the ban on his shirt.

Griggs attempts to resuscitate his failed overbreadth claim by invoking the Indiana Constitution's Free Speech Clause. However, the Indiana Supreme Court refuses to recognize overbreadth challenges under the Indiana Constitution, so this claim is also doomed. *Price v. State*, 622 N.E.2d 954, 957–58 (Ind.1993) ("federal 'overbreadth analysis' has [not] taken root in the jurisprudence of the Indiana Constitution").

Griggs also makes an exceedingly vague claim under the federal Equal Protection Clause. U.S. Const., amend. XIV. However, an equal protection claim requires "some comparative showing of discrimination among similarly situated individuals or classes of individuals," which Griggs fails to provide. *Lunini v. Grayeb*, 395 F.3d 761, 769 n. 5 (7th Cir.2005). Although he claims to have seen other Elmhurst students wearing shirts with "symbols of violence" on them, he introduces no evidence of whether (1) administrators were aware of these shirts; or (2) the students wearing them were punished or forbidden from wearing them again. Since he has thus failed to demonstrate any unequal treatment, this amorphous equal protection claim fails. *Id.* at 769 ("the essence of an equal protection violation is, after all, *discrimination* of some sort").

Finally, Griggs invokes the Indiana Constitution's Privileges and Immunities Clause. Ind. Const., Art. I, § 23. This barely-argued claim is puzzling, as the Privileges and Immunities Clause only concerns "statutes that grant unequal privileges or immunities to differing classes of persons." *Dvorak v. City of Bloomington*, 796 N.E.2d 236, 238 (Ind.2003). There is no evidence that Rule 3, either on its face or as applied, grants unequal privileges to any class of persons, nor does Griggs bother to identify what class of persons that might be. In short, Griggs fails to support this claim with any facts or argument, and thus summary judgment is appropriate.

## V. CONCLUSION

Schools are under undeniable pressure to prevent student violence, and the commitment of the Board and administrators here in that regard is commendable. The Board's general prohibition of "apparel depicting ... symbols of violence" is a reasonable, constitutional tool towards that end.

Yet, the discretion afforded to administrators to censor student speech cannot be limitless. As the Supreme Court eloquently stated, "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506, 89 S.Ct. 733. Although this Court trusts that the Board and its administrators generally interpret Rule 3 within the confines of the First Amendment, in the case of Griggs's Marine Creed shirt, they have gone a bit too far. Griggs's shirt has no relation to the Board's legitimate concerns about school violence, nor is it likely to disrupt the educational process. Thus, the Board's ban on Griggs's shirt cannot stand.

For the reasons given above, Plaintiff's motion for summary judgment (Docket # 43) is GRANTED in part, and Defendants' motion for summary judgment (Docket # 40) is DENIED in part, as to Plaintiff's claim that the application of

Rule 3 to his shirt violates his First Amendment rights. The Clerk is hereby ORDERED to enter a judgment in favor of Plaintiff and against Defendants. The judgment shall DECLARE that Defendants' prohibition on the shirt (reproduced as App. A to this Order) violates Plaintiff's right to freedom of speech under the First Amendment to the United States Constitution.[15] The judgment shall also ENJOIN Defendants from prohibiting Plaintiff from wearing the shirt. The injunction shall be binding not only on Defendants, but also on "their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of [this] order by personal service or otherwise." Fed.R.Civ.P. 65(d).

Defendant's motion for summary judgment is GRANTED in part as to all other claims in Plaintiff's Complaint, and Plaintiff's motion is DENIED in part as to those claims.[16]

---

**15.** *See* 28 U.S.C. § 2201 (authorizing declaratory judgments).

**16.** Also pending are two motions to strike by Defendants. (Docket # 49, 55.) As this opinion does not rely on the material Defendants seek to strike, both motions are DENIED as moot.